Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MICHAEL JAMES BERGER, a single
man also known as Magic Mike,
                    *Plaintiff-Appellee,*

v.

CITY OF SEATTLE; VIRGINIA
ANDERSON, Director of Seattle
Center; MICHAEL ANDERSON,
Emergency Service Manager for
Seattle Center; TEN UNKNOWN
EMPLOYEES/OFFICERS, of the Seattle
Center and the City of Seattle, all
in both their individual and
official capacities,
                    *Defendants-Appellants.*

No. 05-35752

D.C. No.
CV-03-03238-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
March 7, 2007—Seattle, Washington

Filed January 9, 2008

Before: Diarmuid F. O'Scannlain and Marsha S. Berzon,
Circuit Judges, and Sam E. Haddon,* District Judge.

*The Honorable Sam E. Haddon, United States District Judge for the
District of Montana, sitting by designation.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Berzon

## COUNSEL

Gary E. Keese, Assistant City Attorney, Seattle, Washington, argued the cause for the defendants-appellants; Thomas A.

Carr, Seattle City Attorney, Seattle, Washington, was on the briefs.

Elena Luisa Garella, Elena Luisa Garella PC, Seattle, Washington, argued the cause for the plaintiff-appellee and was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must determine the bounds of a city's authority to restrict expression in a public forum.

I

The public forum is the "Seattle Center," an entertainment zone covering roughly 80 acres of land in downtown Seattle, Washington. Each year, the Seattle Center's theaters, arenas, museums, exhibition halls, conference rooms, outdoor stadiums, and restaurants attract nearly ten million visitors. The city wields authority over this large tract of land and has delegated its power to promulgate rules to the Seattle Center Director ("Director"). *See* Seattle, Wash., Municipal Code § 17.04.040. In 1978, the Director issued rules setting forth procedures and requirements governing use of the Seattle Center campus. In 2002, after an open process of public comment,[1] the Director issued a superseding set of provisions in response to specific complaints and safety concerns, which became known as the Seattle Center Campus Rules.

---

[1]Before enactment, the rules were "published in the English language continuously" for six months in the Seattle area. In response to "comments from street performers," the Director made several changes to the rules, such as expanding the number of preordained locations at which performances could take place. The 2002 version was formally adopted on May 31, 2002.

This litigation, originally brought by Michael Berger, a street performer, requires us to consider the validity of five Campus Rules. The first four affect street performers only: Rule F.1 requires a permit for street performances and requires badges to be worn during street performances, Rule F.2 sets the terms of conditions of obtaining a permit, Rule F.3.a bars active solicitation by street performers, and Rule F.5 limits street performances to sixteen designated locations.[2] Another provision affects all persons in the Seattle Center: Rule G.4 forbids speech activities within 30 feet of a captive audience. Berger mounts a facial attack on the constitutionality of these five restrictions.

Berger has performed in the Seattle Center since the 1980s, making balloon creations and "talk[ing] to his audience about his personal beliefs, especially the importance of reading books." In the 1990s, Seattle Center authorities ejected Berger for various violations of the 1978 Campus Rules. In 1996, he sued the authorities, alleging violations of the First and Fourteenth Amendments under 42 U.S.C. § 1983. The city moved for summary judgment, but the magistrate judge denied the motion on the grounds that "substantial authority" supported "a constitutionally protected right to perform magic tricks, create balloon sculptures, and receive voluntary donations in a public park." That case ultimately settled.

When the revised Campus Rules were enacted in 2002, Berger obtained a permit.[3] Yet he continued to face problems with the Seattle Center authorities: members of the public filed numerous complaints alleging that Berger exhibited threatening behavior and Seattle Center staff reported several rule violations. In 2003, Berger filed this complaint seeking damages and injunctive relief for alleged civil rights violations. In particular, he raised as-applied and facial challenges

---

[2]The Seattle Center has not enforced these rules since the district court enjoined their enforcement in May 2005. *See infra*.

[3]Berger renewed his permit through the end of 2004.

to Rules F.1, F.2, F.3.a., F.5, F.7.a,[4] and G.4. In 2005, the district court granted summary judgment to Berger, concluding that these rules facially violated the First Amendment.[5] Pursuant to a stipulation by the parties, the city paid Berger $1 in nominal damages and $22,000 in attorney's fees and costs and the court dismissed with prejudice Berger's remaining and potential claims.[6]

The city timely appeals the district court's order of summary judgment and seeks reversal with instructions to enter summary judgment in its favor.

## II

**[1]** The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I, cl. 2. Expressive activity must be particularly protected in a traditional public forum, such as the Seattle Center:[7]

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the

---

[4]Campus Rule 7.a states: "No performer shall treat any person or animal in a manner that is aggressive, menacing, vulgar, profane, or abusive."

[5]Having concluded that the permit requirement was unconstitutional, the judge did "not address the requirement that permits 'shall be evidenced by a badge that shall be worn or displayed by the performer.' " Furthermore, because Berger failed to offer grounds to support his "cursory challenge" to Rule 7.a, and "cite[d] no case authority" as to that rule, the district court declined to consider that claim. Berger does not challenge that ruling on appeal.

[6]The stipulation did not address the injunction of the Seattle Center rules, which the city contests in its appeal at bar. Berger does not dispute the city's right to bring this appeal.

[7]At the district court, the government argued that Seattle Center should be considered a limited public forum. The district court carefully considered the precedents and evidence on this issue and concluded that "Seattle Center is a traditional public forum." The government does not contest this determination on appeal, and the record supports the characterization.

rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks . . . . In these quintessential public forums, the government may not prohibit all communicative activity.

*Perry*, 460 U.S. 37, 46 (1983). However, "[t]he principles of First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction." *Poulos v. New Hampshire*, 345 U.S. 395, 406 (1953); *see also Near v. Minnesota*, 283 U.S. 697, 716 (1931) ("[P]rotection even as to previous restraint is not absolutely unlimited.").

**[2]** "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Comty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions must satisfy three conditions to be enforceable: (1) they must be "justified without reference to the content of the regulated speech,"[8] (2) they must be "narrowly tailored to serve a significant governmental interest," and (3) they must "leave open ample alternative channels for communication of the information." *Id.* In applying this three-pronged test to the five rules challenged at bar, we review the district court's grounds for summary judgment *de novo. Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

---

[8]A rule failing the content-neutrality threshold must withstand strict scrutiny: "For the State to enforce a *content-based* exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 46 (emphasis added).

### III

### A

We begin with Berger's challenge to the permit requirement. Rule F.1 states that any person wishing to conduct a street performance must obtain a $5 annual permit from the Director. This rule dovetails with the badge requirement in Rule F.1, which mandates that a badge "shall be worn or displayed by the performer in plain view at all times during a performance." Although we address the permit and badge requirements separately, we note that their purposes are intertwined. *See infra*, note 13.

Berger argues that the permit rule fails all three prongs of the test for a reasonable time, place, or manner restriction. The district court held that the requirement passed the first prong of the test but failed the second: the rule was content-neutral but was not sufficiently tailored to a significant governmental interest. Granting summary judgment to Berger on that ground, the district court never reached the third prong of the test.

### 1

**[3]** To determine whether a rule is content neutral, "we do not make a searching inquiry of hidden motive; rather we look at the literal command of the restraint." *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (2005). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A licensing statute lacks content neutrality if it burdens only certain messages or if it imposes a burden on all messages, but allows officials unchecked discretion to treat messages differently. The Supreme Court's decisions in *Cox v. New Hampshire*, 312

U.S. 569 (1941), *Poulos v. New Hampshire*, 345 U.S. 395 (1953), and *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), apply this principle and offer useful guidance.[9]

In *Cox*, the Supreme Court affirmed the convictions of five Jehovah's witnesses who had violated a state statute mandating a license to conduct a "parade or procession" on a public street. 312 U.S. at 570. The Court clarified that the state could enact a legitimate licensing system to ensure "comfort or convenience in the use of streets" but could not allow licensing officials to use the system as a means of content censorship. *Id.* at 577. Finding "no evidence that the statute ha[d] been administered otherwise than in the fair and non-discriminatory manner which the state court [ ] construed it to require," the Court read the statute to be content neutral. *Id.* at 577. The court concluded that the licensing scheme was a valid "exercise of local control over the use of streets for parades and processions." *Id.* at 578.

In *Poulos*, the Supreme Court reiterated that the First Amendment does not preclude permit requirements. There, the Court examined a city ordinance that stated: "No theatrical or dramatic representation shall be performed or exhibited and no parade or procession upon any public street or way, and no open air public meeting upon any ground abutting thereon shall be permitted unless a license therefor shall first be obtained from City Council." *Id.* at 397 n.2 (internal quotation marks omitted). Although the ordinance allowed the city council to charge for parades, processions, or open air public meetings up to $300 per day, and had been applied to bar reli-

---

[9]Berger gives rather short shrift to these cases, instead relying upon our decision in *Grossman v. City of Portland*, 33 F.3d 1200 (1994). We rendered our decision in *Grossman* without the benefit of the Supreme Court's decisions in *Thomas* and *Watchtower Bible*, and cited neither *Cox* or *Poulos* in our analysis. We consider the light shed by our decision in *Grossman* in our later application of doctrine to the particular facts and permit scheme at bar, because Berger argues that *Grossman* offers a binding analogy. *See infra* pp. 226-27.

gious expression, the Court concluded that the licensing requirement was a valid "ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved." *Id.*

Again the Court upheld a permit requirement in *Thomas*, 534 U.S. 316. At issue was a municipal park ordinance requiring a permit to be obtained prior to any "public assembly, parade, picnic, or other event involving more than fifty individuals." 534 U.S. at 319 (internal quotation marks omitted). The claim in that case turned upon whether the city had to enact certain procedural safeguards, set forth in *Freedman v. Maryland*, 380 U.S. 51 (1965), to ensure that the ordinance did not foster censorship.[10] The political activists bringing suit argued that the procedural safeguards applied to all licensing restrictions.[11] The Court, however, held that "*Freedman* is inapposite because the licensing scheme at issue here is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." *Id.* at 322. The Court's explanation bears lengthy quotation:

> We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in

---

[10]The Court "held [in *Freedman*] that a film licensing process must contain certain procedural safeguards in order to avoid constituting an invalid prior restraint: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Id.* at 321 (citations omitted).

[11]Berger makes much of the fact that the *Thomas* decision dealt with a rule restricting expressive activity by groups of fifty-or-more persons. But the Seattle Center's permit requirement is aimed at performances *intended to gather an audience* and thus addresses crowd concerns as well. Moreover, the Court upheld licensing requirements that applied to individuals in *Poulos*, 345 U.S. 395, and *Cox*, 312 U.S. 569. The size of the affected group of speakers is not dispositive.

*Freedman.* "A licensing standard which gives an official authority to censor the content of a speech differs *toto coelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." *Niemotko v. Maryland*, 340 U.S. 268, 282 (1951) (Frankfurter, J., concurring in result). "[T]he [permit] required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved." *Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953). Regulations of the use of a public forum that ensure the safety and convenience of the people are not "inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). Such a traditional exercise of authority does not raise the censorship concerns that prompted us to impose the extraordinary procedural safeguards on the film licensing process in *Freedman.*

*Thomas*, 534 U.S. at 322-23 (footnote and parallel citations omitted). The *Thomas* Court noted that constitutional concerns would arise if a permit requirement granted "unduly broad discretion in determining whether to grant or deny a permit," and thus allowed the state to "favor or disfavor speech based on its content." *Id.* at 323. But the statute in *Thomas* granted no such discretion, and the Court upheld it.

**[4]** Guided by these precedents, we must decide whether Rule F.1 discriminates based on content. Berger argues that the rule does so because it "single[s] out persons who choose to exercise their First Amendment rights through the medium of performance arts." The district court correctly rejected this argument. None of the challenged rules—the permit requirement, the bar on active solicitation, the designation of specific

locations, or the captive audience rule—burdens expressive activity based on "disagreement with the message" of the performer. Contrary to Berger's argument, a rule does not discriminate based on content simply because it restricts a certain "medium" of communication. A "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. We are satisfied that the rules meet the first prong of the test for a valid time, place, or manner restriction speech.

2

We turn to the second prong of the test. A rule is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985).[12] Berger disputes the significance of the city's interests, and also contends that the rule does not match the city's asserted aims to reduce territorial disputes among performers, deter patron harassment, and facilitate the identification and apprehension of offending performers.[13]

---

[12]The Court has used the terms "significant" and "substantial" interchangeably to describe the government's prerequisite interest. *See, e.g.*, *Ward*, 491 U.S. at 799 (citing the need for a "substantial government interest," and then referring to it as a "significant government interest" a few sentences later).

[13]Berger's reference to identification as an aim of the permit requirement underscores the interplay between the badge and permit requirements, because identification is facilitated through the badge requirement —not the permit requirement alone. Without the badge requirement, the permit requirement would not increase the ability of patrons to identify offending street performers, and thus would lose much of its deterrence and enforcement effects. Likewise, without the permit requirement, the badge requirement would never be invoked. We could, of course, imagine a permit system without a correlating badge requirement, or vice versa, but we confine our review to the facts and rules at hand.

**[5]** "As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc'y of Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981). Here, the district court noted the Seattle Center authorities enacted the permit requirement after encountering "chronic" territorial disputes between performers and threats to public citizens by street performers. Testimony from Randy Douglas, a Seattle Center Emergency Services Department Employee, recited some of the troubles:

> Before the performer rules went into effect . . . there were approximately 3 or 4 complaints by performers against other performers per week. If Magic Mike [Berger] was here, we could expect one or more from him . . . . The general complaints by performers against other performers would be 'that is my spot and he can't be there' and/or 'that performer is doing what I am doing and they won't move.' The general complaints by the tenants against performers usually concerned too much noise or blocking access.

These complaints show that street performances posed a threat to the city's interests in maintaining order in the Seattle Center and providing harassment-free facilities. *See Thomas*, 534 U.S. at 322 (upholding a "permit system . . . [that was aimed] not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that [we]re dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage"). We are satisfied that the city's permit scheme was designed to further valid governmental objectives.

We turn next to Berger's claim that the permit requirement is overbroad because it restricts all street performances, but not all street performances are likely to cause harm. Noting that street performances have led to numerous territorial dis-

putes and patron complaints, the city defends its decision to place special requirements on such activities, and asserts that the permit scheme addressed "the exact source of the evil." *Members of the City Council of L.A., et al. v. Taxpayers for Vincent*, 466 U.S. 787, 808 (1984).

[6] We agree with the city that the permit requirement was not overbroad. The requirement affected only a specific form of activity, which had generated documented concerns for patrons and Seattle Center staff. Although the permit requirement affected all street performers, and not only those proven to be disruptive, the city was not required to wait for problems to arise or to speculate as to which performers would pose greater threats. In fact, attempts to discriminate among performers in granting permits could well have destroyed the content neutrality of the permit scheme. A "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 799-800. A permit requirement for all street performances does not exceed the scope warranted by the city's interests in order and accountability.[14]

---

[14]Contrary to Berger's argument, the permit requirement is not invalid under the reasoning in *Cox v. City of Charleston*, 416 F.3d 281 (4th Cir. 2005), as Berger contends. In *Charleston*, the Fourth Circuit deemed invalid an ordinance that made illegal "a small meeting of individuals who gather on the sidewalk . . . to hand out religious tracts without first obtaining a permit, even if their expression does nothing to disturb or disrupt the flow of sidewalk traffic." *Id.* at 286. Berger argues that *Charleston* deems unconstitutional any law that restricts the speech activities of " 'groups as small as two or three.' " (quoting *Charleston*, 416 F.3d at 285). In fact, the *Charleston* court expressly "decline[d] Cox's invitation to announce a numerical floor below which a permit requirement cannot apply." *Charleston*, 416 F.3d at 286. The *Charleston* court invalidated the statute on a different basis—that the city failed to establish "why burdening such expression [wa]s necessary to facilitate its interest in keeping its streets and sidewalks safe, orderly, and accessible." *Id. Charleston* simply underscores the need for an adequate relationship between the challenged restrictions and the problems they are intended to avoid.

The Seattle Center's permit rule is not comparable to the overbroad and untailored licensing ordinance invalidated by the Court in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002).[15] There, the Court invalidated an ordinance requiring any solicitor or canvasser to obtain prior permission before going on private property to promote a cause and to carry a permit on his or her person.[16] 536 U.S. at 155. The Court found that the permit scheme unduly broad and without relationship to a valid government objective.

---

The dissent argues that we have "badly misread[ ] *Charleston*." Dissent at 254 n.6. However, the dissent's note only reaffirms our interpretation. *Id.* ("It emphasized that any 'legislative body' crafting a permit requirement 'should tailor that requirement to ensure that it does not burden small gatherings posing no threat to the safety, order, and accessibility of streets and sidewalks.' "). The quote cited by the dissent shows that the court in *Charleston* did not create a rule based on individuals or large groups but based on the groups' or individuals' effect on "safety, order, and accessibility of streets and sidewalks." *Id.*

[15]Berger did not contend that *Watchtower* should guide our analysis, and his brief stated: "At most, *Watchtower* supports the district court's determination that it was not necessary to reach the issue [of the validity of the badge requirement] where the permit system has been invalidated." However, the case helps illuminate the sort of licensing scheme that would exceed constitutional bounds and provides an apt contrast with the Seattle Center's permit scheme.

[16]The Court found it "unnecessary" to determine whether a lower standard of review would apply to a restriction on private property than in a public forum. *See Watchtower*, 536 U.S. at 164. Chief Justice Rehnquist assailed the majority on this score: "It is not clear what test the Court is applying, or under which part of that indeterminate test the ordinance fails." *Id.* at 175 (Rehnquist, C.J., dissenting). "The Court suggests that [the city's] regulation of speech warrants greater scrutiny [than that applied to restrictions in public forums in *Ward*, 491 U.S. at 791, and *Thomas*, 534 U.S. at 122]. But it would be puzzling if regulations of speech taking place on another citizen's private property warranted greater scrutiny than regulations of speech taking place in public forums. . . ." *Watchtower*, 536 U.S. at 176.

But this case presents different concerns. Street performances do not carry the same "historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas." *Id.* at 163. No evidence suggests that the Seattle Center's permit requirement "imposes an objective burden on some speech of citizens holding religious or patriotic views" or shows "a significant number of persons whose religious scruples will prevent them from applying for such a license." *Id.* at 168.[17] Most importantly, the permit scheme at bar bears a clear relationship to, and furthers, significant governmental interests, whereas the ordinance in *Watchtower* bore no relation to the municipality's stated purposes of fraud prevention and privacy. *See id.* at 169-70 (noting that criminals would likely ignore the permit requirement, as they did other aspects of the law, and carrying a permit would not make solicitors less intrusive). Finally, the Seattle Center does not have a rule that will satisfy the same purposes, as did the village in *Watchtower. See id.* at 169 (noting that another rule allowed residents to post "No Solicitation" signs and made it a *crime* to solicit despite such signs[18]). We conclude that *Watchtower* does not support invalidation of the permit scheme at bar.[19]

---

[17]This chilling effect was corroborated by the statements of the Jehovah's Witnesses objecting to the ordinance. Berger offers no evidence that street performers faced similar impediments, and he never argues that he had a moral or religious objection to obtaining a permit, as he did through 2004.

[18]Chief Justice Rehnquist pointed out in dissent that this rule might lead to far greater limits on speech, because it allowed citizens to "cut off door-to-door communication altogether" with the support of criminal sanction. *Id.* at 181 (Rehnquist, C.J., dissenting).

[19]Berger's attempt to invoke other cases in which the Court invalidated licensing schemes does not assist him, for the rules at issue in those cases permitted *content-based* censorship. In *Cantwell v. Connecticut*, 310 U.S. 296 (1940), the Court invalidated a statute requiring prior approval by the secretary of the public welfare council before solicitation "for any alleged religious, charitable, or philanthropic cause." *Id.* at 301. The statute gave enormous discretion to the secretary to "determine whether such cause is

**[7]** Nor does the permit requirement fail the narrow tailoring test for underinclusiveness.[20] Berger argues that the rule does not match its purpose because it "targets street performers while allowing large crowds engaged in other types of expression to gather without a permit." However, narrow tailoring does not require comprehensiveness: a rule is "narrowly tailored" as long as the significant interest of the government

---

a religious one or is a bona fide object of charity or philanthropy and conforms to reasonable standards of efficiency and integrity." *Id.* at 302. The Court decided that the statute violated the free exercise clause of the First Amendment because it constituted a "censorship of religion." *Id.* at 305.

Likewise, in *Schneider v. New Jersey*, 308 U.S. 147 (1939), the Court deemed unconstitutional a content-based statute that subjected prospective speakers to "the power of a police officer to determine, as a censor, what literature may be distributed." *Id.* at 163. And in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), the Court invalidated an ordinance requiring permits for solicitation and *barring* any such solicitation "by charitable organizations that do not use at least 75 percent of their receipts for 'charitable purposes.' " *Id.* at 623. The Court did not object to the provision *requiring* permits for organizations that passed the 75-percent threshold; rather, the Court found unjustifiable the rule *denying* permits to organizations that did *not* pass such threshold. The Court did not object to the fact that a permit was required, but to the reasons for which permits could be denied. *See id.* at 640 ("The 75-percent requirement plainly is insufficiently related to the governmental interests asserted in its support to justify its interference with protected speech."). Citing its prior rulings in *Cantwell*, *Jamison v. Texas*, 318 U.S. 413 (1943), and *Schneider*, the Court reiterated that " 'a state m[ay] not prevent the collection of funds for a religious purpose by unreasonably obstructing or delaying their collection.' " *Village of Schaumburg*, 444 U.S. at 631.

The statutory rules rejected in *Cantwell, Schneider, Jamison, and Village*, can be distinguished easily from the Seattle Center's permit requirement, which does not support such content-based censorship.

[20]The district court disagreed, holding the rules to be underinclusive because they did not reach activities with "a greater impact on Seattle Center patrons and tenants" and to be overbroad because they barred more expression than "they were intended to reach." The court did not reach Berger's final argument, that the rules foreclose all avenues of communication "because no performances are permitted anywhere at the Seattle Center without a permit."

"would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689. The Supreme Court "frequently has upheld underinclusiveness classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 215 (1975),[21] and this court has rejected the argument that "a city's means to achieve its significant interest of restoring and maintaining security can never be narrowly tailored absent a policy completely efficacious in eliminating [the targeted evil]," *Menotti*, 409 F.3d at 1134 n.41. In this case, the city has demonstrated the efficacy of its revised Campus Rules with testimony that "[a]fter the performer permit rules went into effect, Emergency Service rarely received any complaints regarding performers." The disturbances that did occur were largely caused by Berger and were reported by Seattle Center employees.[22] Although the Director might have drafted a rule sweeping more widely, so as to avoid disturbances caused by other forms of activity also, he was not required to impose further restrictions on expression. Because the permit requirement furthers significant governmental interests, it is not impermissibly underinclusive.

[8] We also find that the permit scheme does not grant the Director undue discretion so as to allow content censorship. As in *Poulos*, the permit scheme functions in a "ministerial," and "routine" fashion. 345 U.S. at 403. We see no signs of

---

[21]In *Erznoznik*, the Court noted that the "presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression," 522 U.S. at 215, and deemed unconstitutional a *content-based* bar on cinematic expressions containing nudity as part of "a regulation designed to protect traffic." 522 U.S. at 216. The rules applied by the Court in *Erznoznik* provide guidance, but the facts at bar are demonstrably different: the Campus Rules are content-neutral and carefully fitted to the problems they seek to address.

[22]Seattle Center authorities reported that since the adoption of the Campus Rules, their Emergency Services Unit filed eight incident reports involving Berger, one of which resulted in the suspension of his permit.

censorship in the text or application of Rules F.1 and F.2. These rules do not permit discretion in issuing permits; a permit "*is* issued upon [the] Director's satisfaction that the information set forth in the application is true, the applicant has executed a statement stating that he or she will comply with applicable law and all provisions of the Seattle Center rules, and has paid the applicable application fee." (emphasis added). The Director has no power to reject a completed permit application. While the Director may terminate or revoke a permit, even that decision depends upon the satisfaction of objective criteria or requires 7-day notice.

Berger offers absolutely no evidence revealing content censorship, and we will not presume that the city will read or apply its permit rule to allow such censorship, especially at the summary judgment stage. *See Cox*, 312 U.S. at 577 (rejecting a claim of impermissible discretion where "[t]here is no evidence that the statute has been administered otherwise than in the fair and non-discriminatory manner which the state court has construed it to require"). Indeed, the evidence shows that the Director has granted permits even to street performers with a history of complaints against them, such as Berger.[23] Like the valid licensing schemes in *Poulos*, *Cox*, and *Thomas*, the Seattle Center's permit requirement is narrowly tailored to further valid governmental objectives and suffers neither from a discretion-based potential for censorship nor from overbreadth.

Like the Supreme Court's precedents, our own caselaw confirms that we have no basis to invalidate the permit requirement at bar. The district court's reliance on *Grossman v. City of Portland*, 33 F.3d 1200 (1994), was misplaced. In *Grossman*, we struck down a content-neutral permit scheme

---

[23]The record reveals that "[i]n the year prior to the permit system, 70% of [the] performer complaints came from Michael Berger . . . and/or were in regards to him," yet Berger received a permit to perform in the Seattle Center the very next year.

that led to the arrest of a man engaged in a "small, peaceful anti-nuclear protest involving six to eight people, in Portland's Waterfront Park." *Id.* at 1202. The ordinance in *Grossman* rendered it "unlawful for any person to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in a park without the written permission of the [Parks Commissioner]." *Id.* at 1204. The ordinance imposed a 7-day *waiting period* for such permits, thus "requir[ing] potential speakers, demonstrators and entertainers to plan their activities well in advance, precluding such persons from using the parks for more spontaneous speech activity." *Id.* at 1204. We concluded that this rule was overbroad. *Id.*

The Seattle Center's routine permit requirement can be easily distinguished from the sweeping scheme in *Grossman*. First, the Seattle Center's permit rule simply applies to street performances, designed to engage members of the public, which may lead to congestion problems or altercations with members of the public, as the record reveals. The Seattle Center's permit rule imposes *no* waiting period, and permits are issued routinely. The rule does not require the sort of advance planning necessitated by Portland's restriction on speech activities, let alone limit all forms of speech.

Berger attempts to analogize the ordinance in *Grossman* with the permit scheme at bar by arguing that the rule targets spontaneous expression that does not pose a threat to order or patron convenience. In addressing this claim, we note that the Seattle Center has not implemented its permit requirement to limit spontaneous expression, and the city assets that "the performance permit requirement should be construed to regulate only performances aimed at attracting an audience, not spontaneous singing or dancing engaged in solely for personal expression." We give due consideration to the government's interpretation and past application of its rule. "Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a

facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.' " *Ward*, 491 U.S. at 795-96.

**[9]** In *Thomas*, the Court recognized that the text of the rule might be interpreted to give undue discretion to deny a permit, but accepted the Park District's assertion that permits would not be denied for "inadequacies that, under the circumstance, do no harm to the policies furthered by the application requirements." 534 U.S. at 781; *see also United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002) (en banc) ("The Supreme Court instructs us that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' " (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)). We read the rule to apply only to conduct aimed at attracting an audience—the sort of conduct that the city cites as the source of its concerns. In light of those interests, and the limited scope of the restriction, we are satisfied that Rule F.1 is narrowly tailored to significant governmental interests and avoids the constitutional infirmities discerned in Portland's overbroad licensing scheme in *Grossman*.

3

**[10]** Finally, we consider Berger's argument that "[t]he permit requirement does not provide ample alternative channels for communication of a performer[']s message because no performances are permitted anywhere at the Seattle Center without a permit." Our precedent notes that "[i]n the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *Menotti*, 409 F.3d at 1141. Under the Campus Rules, a performer may, without a permit, "convey his or her message verbally while walking through the campus," and "like

all other Center visitors, may leaflet, gather signatures, and make speeches without any permit."[24]

**[11]** It is clear that "ample alternative channels" do not require the *exact* same means of expression in the *exact* same location. In *One World One Family v. City & County of Honolulu*, 76 F.3d 1009 (9th Cir. 1996), we upheld a Waikiki-wide ban on the sale of message-bearing t-shirts on sidewalks. We concluded that vendors could locate off the sidewalks and thus retained "a number of alternative means of disseminating their message, each of which allows them to communicate effectively with people on the sidewalks." *Id.* at 1014-15. Although the ban was sweeping—precluding such sidewalk sales throughout Waikiki—we found the rule to be valid: "The broader the ban, of course, the more difficult it is to prove that the remaining means of communication are adequate. Difficult, however, doesn't mean impossible." *Id.* at 1015-16. We conclude that the permit requirement satisfies the third prong of the test for a reasonable time, place, or manner restriction on speech, and must be upheld.

### B

Turning now to Berger's challenge to the badge requirement, we have already noted the intertwined nature of the permit and badge requirements. *See supra* note 13. The district court did not rule on the validity of the badge requirement

---

[24]The permit requirement is less limiting than the rule we upheld in *Menotti*, which barred access to portions of downtown Seattle during a World Trade Center conference. This court found ample alternatives for expression in that case, noting that protestors could demonstrate in nearby zones, such as "across from the Washington State Convention & Trade Center, the Paramount Theater, three out of four major hotels where WTO delegates were staying, and throughout the rest of downtown Seattle." *Menotti*, 409 F.3d at 1141. Similarly, the Campus Rules do not limit performances outside the Seattle Center, and, unlike in *Menotti*, access to internal locations remains possible if the performer obtains a routinely issued permit.

because it deemed the permit requirement—of which the badge requirement is a part—to be invalid. Because we conclude that the permit requirement satisfies the three conditions for a time, place, or manner restriction on speech, we must ask also whether the badge requirement imposes some additional burden that tips the balance against the rule.

[12] Berger contends that the badge requirement generates a further impediment to free expression because "[p]erformers often wear costumes, which are a carefully-crafted part of the speech itself," and "[t]he integrity of this part of the message may be damaged by a clip-on identification badge." Berger rests this claim upon the Court's decision in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999), in which the Court invalidated a Colorado regulation "requiring [voter-]initiative-petition circulators to wear identification badges." *Id.* at 198.

[13] At first sight, the Seattle Center's badge requirement appears similar to that deemed invalid in *Buckley*: the Seattle Center's interest in enforcing its permit requirement can be likened to Colorado's aim of "enabl[ing] the public to identify, and the State to apprehend, petition circulators who engage in misconduct." *Id.* at 199. However, a closer reading of *Buckley* defeats the analogy. Unlike Seattle Center's content-neutral badge requirement, Colorado's badge requirement targeted speech based upon its message. *See id.* at 210 (Thomas, J., concurring) ("[T]he regulation must be evaluated under strict scrutiny [because] the category of burdened speech is defined by its content—Colorado's badge requirement does not apply to those who circulate candidate petitions, only to those who circulate initiative or referendum proposals."). Moreover, Colorado's interest in avoiding voter fraud was not clearly furthered by the badge requirement and provided no "sufficient cause" to limit the traditional right to anonymous political speech. *Id.* at 200-01.

[14] The *Buckley* Court's protection of anonymous political speech does not require us to discern an inviolable right to

anonymous artistic performances, although Berger argues that "[s]treet performers may be just as concerned with their public anonymity as street preachers, political protestors or anyone else." The importance of avoiding political retribution does not compare to a street performer's desire to maintain the "integrity" of his costume. In *Buckley*, the Court received evidence that the badge requirement chilled speech because it exposed voter-initiative circulators to "the recrimination and retaliation that bearers of petitions on 'volatile' issues sometimes encounter." 525 U.S. at 199. Berger cites no similar evidence of a chilling effect and does not assert that his own speech was chilled by the permit requirement. Even if we were to conclude that the badge requirement might cause some performers to avoid the Seattle Center, this consideration is outweighed by the Seattle Center's significant interests in enforcing its permit rule and ensuring accountability of performers. Because the badge requirement applies coextensively with the permit rule, our earlier analysis explains that adequate alternative avenues of expression remain, in which no badges need be worn. We conclude that the badge requirement, like the permit rule, passes all three prongs of the test for a valid time, place or manner restriction.

## C

We next consider Berger's challenge to the Seattle Center's rule limiting the mode of solicitation by street performers. Rule F.3.a states that "[n]o performer shall actively solicit donations, for example by live or recorded word of mouth, gesture, mechanical devices, or second parties," but allows performers to seek donations "passively in an instrument case or other receptacle provided for that purpose by the performer," which "may include a written sign that informs the public that such donations are sought." Again, Berger argues that the rule is content-based because it burdens only street performers. We have explained above why this argument must be rejected.[25] *See supra* pages 214-18. Berger also argues that the rule

---

[25]We explained that a burden on a mode of expression alone does not constitute content discrimination against a message. The same applies to

is not narrowly tailored because it "targets a particular group of people and not a particular problem such as aggressive begging." The district court agreed, holding that Rule F.3.a could not satisfy the second prong of the restriction test: "As with the permit requirement, . . . the active solicitation ban is not narrowly tailored. . . . Even more so than with the Rules' permit requirement, the mismatch between the solicitation ban's aim and its reach is fatal to its constitutionality."

Our narrow tailoring analysis starts with a view of the city's interests. The city asserts that Seattle Center authorities created Rule F.3.a in response to patron complaints regarding "pushy or overbearing performers," and tailored the rule to ensure the convenience of patrons and to avoid performances that might interfere with pedestrian traffic or Seattle Center exhibitions. Our caselaw confirms that an "interest in protecting the safety and convenience of persons using a public forum is a valid government objective" and "[g]overnment interests in promoting public safety and the orderly movement of pedestrians, and in protecting the local merchant economy are also substantial." *Perry v. L.A. Police Dept.*, 121 F.3d 1365, 1371 (9th Cir. 1997); *cf. Heffron*, 452 U.S. at 652 (noting that the State has a significant interest in "avoiding congestion and maintaining the orderly movement" of patrons at a public fair).

[15] We have previously upheld bans on certain forms of solicitation.[26] In *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), we addressed a city ordinance which prohib-

___

the solicitation rule, which applies to all performers regardless of their message. Berger cites no evidence suggesting content discrimination in the text or application of Rule F.3.a (barring active solicitation by street performers).

[26]Rule F.3.a does not completely ban solicitation, for it restricts only active solicitation, while expressly allowing passive solicitation. Cases such as *Perry v. Los Angeles*, 121 F.3d 1365, 1371 (9th Cir. 1997) (invalidating a total bar on solicitation for certain groups), do not apply.

ited fund solicitation from occupants of vehicles stopped at intersections, in order to ensure road safety. The court noted that solicitation may cause problems not engendered by other forms of speech:

> Although appeals for funds are indeed protected under the First Amendment as speech-related conduct, *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980), solicitation goes beyond pure speech in the response it demands on the part of the audience. Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the individual to respond by searching for currency and passing it along to the solicitor.

*Id.* at 1268-69 (internal quotations omitted). Although we acknowledged that the city possibly could have "served its interests with a less restrictive means by prohibiting only solicitation that disrupted traffic," it found the ordinance "narrowly tailored to address legitimate traffic safety concerns." *Id.* at 1270; *see also Doucette v. City of Santa Monica*, 955 F. Supp. 1192, 1205 (C.D. Cal. 1997).

Although not binding in this Circuit, the D.C. Circuit's decision in *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949 (D.C. Cir. 1995), provides helpful analysis. There, the court invalidated a Park Service ban on in-person solicitation. Although it noted that "the Supreme Court recently recognized that solicitation is a more intimidating and disruptive form of expression than leafletting," *id.* at 955, and agreed that the Park Service has a legitimate interest in avoiding "the ills associated with runaway solicitation," *id.* at 956, the court found the ban on in-person solicitation overbroad: "[W]e cannot see how allowing in-person solicitations within the permit area will add to whatever adverse impact will result from the special event itself." *Id.* The court emphasized the narrow nature of its holding: "Our holding allows only those individ-

uals or groups participating in an authorized demonstration or special event to solicit donations within the confines of a restricted permit area such as that assigned to ISKCON. It does not require the Park Service to let rampant panhandling go unchecked." *Id.*

**[16]** Unlike the solicitation ban in *ISKCON*, which bore an at-most attenuated relationship to the interests of the Park Service, the Seattle Center's bar on active solicitation directly addresses the problems of heckling and patron disturbance revealed in prior complaints. Our reasoning in *ACORN* and the considerations noted by the D.C. Circuit in *ISKCON* support a conclusion that the Seattle Center's bar on active solicitation was narrowly tailored to the city's significant interest in protecting the Center's patrons from disruptive and unwanted advances.

**[17]** In addition to being content neutral and narrowly tailored, Rule F.3.a leaves open ample alternative avenues for solicitation. Contrary to Berger's contention that street performers "are completely barred from requesting donations," the Campus Rules expressly provide: "Donations for performances may be accepted passively in an instrument case or other receptacle provided for that purpose by the performer. The receptacle may include a written sign that informs the public that such donations are sought." The bar only reaches *active* solicitations, which were the source of the complaints brought to the attention of Seattle Center authorities. Performers retain ample means to solicit funds without harassing patrons. This rule satisfies the third and final prong of the test and is a reasonable restriction on expression.

## D

We next turn to Berger's constitutional challenge to Rule F.5, which confines street performances to sixteen "designated locations on the Seattle Center grounds," and specifies these by reference to a map provided with the permit applica-

tion. The map shows the designated locations and states the "maximum number" of persons who may perform simultaneously at each. These locations include five positions close to the Space Needle, as well as other locations beside popular sites such as the Fun Forest Amusement Park, the Center House, the Mura Amphitheatre, the Key Arena, the Memorial Stadium, the International Fountain, and exhibition halls. The rules impose a limit of two performers at most sites. Berger argues that the rule limiting locations fails all three prongs of the test for a valid restriction on speech.

The district court held that Rule F.5 was content neutral and "designed to confine street performers to certain areas to mitigate their adverse impact on Seattle Center patrons." Although this aim constituted a significant governmental interest, the district court nevertheless held that "[t]he City's failure to narrowly tailor its restriction on where street performances can occur is also fatal to its constitutionality." At the crux of the district court's decision was its view that the rule was underinclusive: "As with the permit requirement, the City presents no justification for these restrictions in light of the freedom of groups of up to 99 people who are not street performers to congregate whenever they please."

**[18]** We share the district court's view that Rule F.5 is content neutral. The rule does not permit Seattle Center authorities to discriminate based on a performer's message, and we have explained that a rule barring a certain medium of expression is not a content-based limitation.

We cannot accept the district court's narrow tailoring analysis, however. Supreme Court precedent instructs us to the "general effect" of the rule and not to invalidate the rule "simply because there is some imaginable alternative that might be less burdensome on speech." *Albertini*, 472 U.S. at 689. Here, the city's rule allowed the Director to confine street performances to locations that did not pose concerns for pedestrian traffic and enabled Seattle Center security personnel to focus

on areas in which audiences might be gathering. As the district court noted, the rule helped mitigate the adverse impact of street performances.

**[19]** The rule cannot be deemed overbroad. Street performers limited by the rule could still perform in numerous well-located sites, including those near some of the most popular Seattle Center attractions. *See supra* p. 234. The rule therefore can be distinguished readily from the location limitation we held invalid in *Kuba v. 1-A Agricultural Association*, 387 F.3d 850 (9th Cir. 2004). There, a state-owned performance facility, the "Cow Palace," had enacted a rule restricting public demonstrators to three "free expression zones." *Id.* at 854.[27] All three zones lay on the perimeter of the parking lot and were at least 200 feet way from the main doors to the Cow Palace. *Id.* We found the first and second prongs of the time, place, or manner test to be satisfied. *Id.* at 858 (holding that the location limitation furthered the significant governmental interests of ensuring "pedestrian and traffic safety" and "preventing traffic congestion"). But we objected to the breadth of the rule, which confined demonstrators to distant locations unfrequented by pedestrians and thus "ma[de] communication 'virtually impossible.' " *Id.* at 854. Such scope lacked proper justification: we discerned no evidence that "handing out leaflets and carrying signs on the parking lots and walkways outside [the facility] would cause . . . congestion and danger." *Id.* at 859. For that reason we held that "[t]he present policy, which relegates communication activity to three small, fairly peripheral areas, does not 'sufficiently match' the stated interest of preventing congestion, and so is not narrowly tailored to serve the government's interest." *Id.* at 862 (citation omitted).

We carefully explained that our decision in *Kuba* was consistent with the Supreme Court's decision in *Heffron*, 452

---

[27]Although the Cow Palace was not a traditional public forum such as we encounter at bar, the same time, place, or manner test applied.

U.S. 640. In *Heffron*, the Court upheld a rule confining exhibitors to certain fixed locations within the Minnesota State Fair against a First Amendment challenge brought by religious persons wishing to distribute and to sell faith-based literature and solicit donations at non-designated locations. *Id.* at 656.[28] The Court found that the rule was content-neutral and supported the government's significant interest in "avoiding congestion and maintaining the orderly movement of fair patrons." *Id.* at 652. The Court also explained that the rule satisfied the third prong of the time, place, and manner test because it "does not exclude [the religious group] from the fairgrounds, nor does it deny that organization the right to conduct any desired activity *at some point* within the forum. Its members may mingle with and orally propagate their views. The organization may also arrange for a booth and distribute and sell literature and solicit funds from that location on the fairgrounds itself." *Id.* at 655.[29]

The facts in *Kuba* led us to a different conclusion, however. There, we contrasted the circumstances that led the Court to uphold the location limitation in *Heffron* with the facts before us in *Kuba*. "The organization and layout of the Minnesota State Fair encourage[d] milling about rather than purposeful movement toward a single central location," and "the fair-

---

[28]The grounds of the Minnesota State Fair "comprise[d] a relatively small area of 125 acres, the bulk of which is covered by permanent buildings, temporary structures, parking lots, and connecting thoroughfares." *Heffron*, 452 U.S. at 651. To that extent, the grounds mirror those of the Seattle Center—unsurprisingly, as the latter was built for the 1962 Seattle World's Fair. *See* Don Duncan, *Meet Me at the Center* (Seattle Ctr. Found. 1992). And although the *Heffron* court ultimately stated that the "Minnesota State Fair is a limited public forum," 452 U.S. at 656, its application of the time, place, or manner test offers guidance at bar. And the *Heffron* Court did not state that the fair was a limited public forum until after reaching all three prongs of the test for a valid time, place, or manner restriction on speech.

[29]The *Heffron* Court found these means of communicating a message to be sufficient in a limited public forum. It did not rule on whether these avenues would be sufficient in a traditional public forum.

grounds as a whole were the destination of the Fair's patrons, most if not all of the areas would be equally congested." *Kuba*, 387 F.3d at 863. This was not true for the "parking lots and walkways" at the Cow Palace. *Id.* at 862. We also emphasized that "the number of visitors and exhibitors at the Minnesota State Fair . . . was vastly greater than the number of visitors and exhibitors at the [facility in *Kuba*]" and the parking lots in *Kuba* "[we]re not stopping places for patrons." *Id.* at 863. Finally, we stated that "while at the Fair the booths available for distribution of literature 'are located within the area of the fairgrounds where visitors are expected, and indeed encouraged, to pass,' [the rule c]ordoning protestors off in a free expression zone the size of a parking space, located over 200 feet from the entrance [to the facility in *Kuba*] far from encouraging interaction with them, is more likely to give the impression to passers by that these are people to be avoided." *Id.* at 863 (citing *Heffron*, 452 U.S. at 655 n.16).

The contrast between *Heffron* and *Kuba* illustrates the distinction between permissible and illegitimate location restrictions. The Seattle Center's rules further significant city interests, by keeping street performances from posing threats to the flow and convenience of Seattle Center patrons in heavily congested areas and entrances to buildings. *See Kuba*, 387 F.3d at 850 ("The Policy certainly furthers the governmental interest in preventing congestion. It would be hard to imagine an exclusion of speakers from a given area that did not meet this interest, at least marginally."). Unlike in *Kuba* we note substantial evidence that the attraction of an audience in many locations would pose concerns for crowd control. Unlike leafletting and carrying signs, a street performance seeks to gather an audience, and thus even a single performer can generate congestion problems. *Compare Kuba*, 387 F.3d at 860 (finding it implausible that "Kuba and the handful of other demonstrators would contribute significantly to the congestion and traffic danger if allowed to demonstrate in any area other than the free expression zones"). Nearly ten million visi-

tors visit the Seattle Center each year. While the number of street performers is small—testimony suggests that typically only 5-8 performers seek street performance permits even during peak hours—such activities create a legitimate concern for crowd control. Given that the rule still permitted street performances in sixteen locations near popular Seattle Center sites, we conclude that the rule was not overbroad.

We also reject the conclusion of the district court that the rule was underinclusive. "The validity of such regulations [that 'control the time, place, and manner of expression'] does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests." *Id.* at 688-89. As we have noted, a time, place, or manner restriction on speech is sufficiently tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 689. The city was not required to restrict *all* possible expressive activities that would lead to the same sort of problems in order to create a valid rule to ensure order. While the district court highlighted the fact that larger groups conducting activities are not similarly confined, we note that such groups face other restrictions designed to preserve order. For example, Rules E.1-E.15 require licenses for activities that require props or amplification, as most large-scale gatherings would.[30] The fact that Rule F.5 simply addresses a specific kind of potential congestion hazard and threat to patron convenience does not render it underinclusive. Because the rule serves a significant government objective and is neither overbroad nor underinclusive, we hold that it satisfies the second prong for a valid restriction on expression.

---

[30]Berger does not challenge those rules or dispute their role in ensuring order in activities not covered by Rule F.5. We consider these other provisions relevant to show that the government has not selectively targeted certain activities for restriction, however, applying "the cardinal rule to construe provisions in context." *United States v. Balsys*, 524 U.S. 666, 673 (1998).

**[20]** Applying the third prong, we conclude that Rule F.5 also leaves alternative modes of expression available in cases where too many performers request the same site. The rule sets forth *sixteen* locations (a number of which were added pursuant to street performer requests).[31] The record shows that only 5-8 performers have sought permits at the same time—even during peak times. Berger does not offer any evidence that a performer has been unable to perform in the Seattle Center due to this rule. His claim amounts to a demand for the right to perform in the Seattle Center at *whatever* venue he chooses. That claim cannot be reconciled with the city's significant interest in maintaining order and patron convenience. A venue requirement is not a prohibition on speech, but a reasonable limit designed to further significant government interests.[32] Rule F.5 passes all three prongs of the test for a valid time, place, or manner restriction on speech.

E

Having determined that rules F.1, F.2, F.3.a, and F.5 pass constitutional review, we turn, finally, to Berger's claims against Rule G.4, which applies to all Seattle Center entrants. This rule prohibits speech activities "within thirty (30) feet of any captive audience; or within thirty (30) feet of any building entrance; or within thirty (30) feet of any person engaged in any scheduled event that is sponsored or co-sponsored by the Seattle Center." The rules exempt city employees and licensed concessionaires. Berger asserts that the " 'captive

---

[31]During the period of public comment prior to final enactment of the 2002 Campus Rules, *see supra* note 1, the proposed rule was amended to offer more locations for street performances, in response to street performer requests. This underscores the Seattle Center's efforts to tailor narrowly the rule to impose a reasonable limitation to conserve its interests, without unnecessarily hindering expression.

[32]Furthermore, persons like Berger can express their messages to patrons throughout the Seattle Center in other ways; Rule F.3.a only applies if they want to conduct street performances that may gather an audience.

audience' " rule cannot stand because the doctrine permitting such restrictions on speech "is not applicable in a traditional public forum." The district court invalidated the "captive audience rule" based on its conclusion that "[n]o court has recognized the desire to protect captive audiences in a traditional public forum as a significant government interest."[33]

We look to our precedent on this issue. In *Kuba*, we addressed the validity of a policy limiting demonstrators to "free expression zones," as described above. This policy also prohibited "discussions" between demonstrators and patrons "within 75 feet of the entrance and within the fire lane." *Id.* at 862. Because we held that the entire policy was not narrowly tailored, we never specified the possible validity of the 75-foot rule in isolation. And the case at bar represents very different considerations. Unlike the mobile audience in *Kuba*, which could easily avoid the demonstrators, the Seattle Center patrons waiting in line for events cannot move away without sacrificing their enjoyment of Seattle Center facilities. They are more like the "captive audience" on the streetcar in *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), who cannot escape unless they give up the ride.

**[21]** As the Court has made clear, the "captive audience" doctrine does not require literal captivity or inability to escape. In *Madsen v. Women's Health Center, Inc.*, 512 U.S. 752 (1994), the Court considered women entering an abortion clinic to be "held 'captive' by medical circumstance" and therefore unable easily to escape demonstrators outside the clinic. *Id.* at 769. At issue was a state court ruling that barred abortion protestors from expressive activities "within 36 feet

---

[33]The court cited *Erznoznik*, 422 U.S. at 209, *Heffron*, 452 U.S. 640, 650 n.13 (1981), and *Kuba*, 387 F.3d at 861 n.10. These cases do not support its ruling. In *Heffron*, the Court expressly declined to discuss a captive audience argument. 452 U.S. at 650 n.13. In *Erznoznik*, the Court rejected a paternalistic "captive audience" rule advanced to support a *content-based* bar on nude films. 522 U.S. at 209.

of the property line of the clinic as a way of ensuring access to the clinic." *Id.* at 768. The Court "h[e]ld that the 36-foot buffer zone around the clinic entrances and driveway burdens no more speech than necessary to accomplish the governmental interests at stake," but that the "portion of the buffer zone [on private property along the back and side of the clinic] . . . burdens more speech than necessary to protect access." *Id.* at 771. Just as in *Madsen*, Seattle Center Patrons *could* choose to turn around and go home. But the Seattle Center offers desirable facilities for public entertainment, relaxation, and edification. Its authorities had the right to protect captive audiences seeking to enjoy such functions without being forced to choose between enduring harassment and leaving the facilities.

The 30-foot limitation imposed by the Seattle Center authorities to accomplish this purpose was reasonable and tailored to the interests at stake. It included only the spaces proximate to captive patrons—a far smaller area than fell within the 75-foot ban in the Cow Palace in *Kuba*. As the district court noted, "[t]he general captive audience restriction targets visitors' complaints about unwanted harangues and solicitations while waiting in line for Seattle Center events."[34] Moreover, the captive audiences protected by the rule do not compare to the mobile visitors to the Cow Palace, who could have avoided demonstrators by walking another way without losing access to the facilities. The Seattle Center was not unreasonable in concluding that such zone was necessary to protect visitors confined to a fixed location while waiting to enjoy its facilities.

[22] The third prong of the test is satisfied by this rule as well. Rule G.4 does not disallow verbal communications to

---

[34]We see no evidence that these same concerns are generated by concessionaires, and because a rule will not fail because it addresses some, but not all, possible sources of harassment, the rule does not fail because authorized vendors are permitted to offer concessions to waiting patrons.

non-captive audiences or at a greater distance than 30 feet. The captive audience rule does not silence a message in the Seattle Center, but only prevents it from being expressed in locations where it would pose a serious threat to order and to the convenience and peace of patrons.[35] The Seattle Center's content-neutral captive audience rule was sufficiently tailored

---

[35]The dissent criticizes our use of *Madsen* in upholding the 30 feet limitation on permit holders. Dissent at 262. The Dissent argues that the "privacy and self-determination interests involved in" *Madsen* are inapplicable in this case. *Id.* With all due respect, just as the Supreme Court has recognized a privacy interest that gives rise to a right to abortion, as against the government, *see Planned Parenthood v. Casey*, 505 U.S. 833 (1992), it has also recognized that the First Amendment of the U.S. Constitution protects a person's interest in expression. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 647-48 (2000) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984), for the legal principle "that 'implicit in the right to engage in activities protected by the First Amendment' is 'a corresponding right to associate with others in pursuit of wide variety of political, social, economic, education, religious and cultural ends' "). Here, for example, the 30 feet permit limitation protects families and friends from having their intimate associations interfered with. *See Dale*, 530 U.S. at 646-47. If the government can limit the religious expression of protestors on public sidewalks to promote the "privacy and self-determination interest" of women seeking abortions and abortionists, there is no reason it cannot legitimately protect others wishing to exercise their interest in private and public expression in intimate association with family and friends at a picnic. *See supra* at 239-43.

The Dissent also cites to *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 378-79 (1997) ("[I]t would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction."), in support of its proposition that the 30 feet limitation should be struck down as an impermissible "floating buffer zone." Dissent at 265, 266. The Dissent's reliance to *Schenck* is misplaced. First, unlike *Schenck*, where the "floating buffer zone" applied to the whole area that was available to street counselors to share their message, *Schenck*, 519 U.S. at 377-79, the buffer zone in this case is limited only to certain areas, not to all of the Seattle Center. *See supra* at 239-42. Second, there is no indication in this case that the buffer zone has prevented the performers from sharing their message with individuals at the Seattle Center, unlike in *Schenck* where the "floating buffer zone" effectively prevented any communication by counselors. *Schenck*, 519 U.S. at 378-79.

to its significant interest in preventing patron harassment and disturbances, did not exclude more speech than necessary, and left open ample alternatives for communication. The captive audience rule may stand.

IV

Berger raises a different but related challenge based on the Equal Protection Clause of the Fourteenth Amendment. He addresses this claim only to the permit requirement, and argues that the rule creates impermissible "distinctions among groups of people." Because the logic of this argument applies equally to all street-performance-specific rules, we construe this argument as a challenge not only to Rule F.1 (the permit and badge requirement), but also to Rule F.2 (the permit terms and conditions), Rule F.3.a (the active solicitation bar), and Rule F.5 (the locations limitation).

**[23]** We agree with Berger that the proper standard can be found in the Supreme Court's decision in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). There, the Court stated that "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. A restriction faces strict scrutiny only if it targets a suspect class or a fundamental right. *See id.* This court has specifically addressed the relationship between equal protection and free speech. In *Rubin v. City of Santa Monica*, 308 F.3d 1008 (9th Cir. 2002), we rejected an equal protection challenge to a rule barring a voter from designating "peace activist" as his occupation. We noted that the case required both "free speech and equal protection analyses." *Id.* at 1019. We concluded: "Neither 'nonincumbents' nor 'peace activists' is a suspect class. Therefore, rational basis review is appropriate unless the restriction unconstitutionally burdens a fundamental right, here, the right to free speech. Because we conclude that the restrictions do not unconstitutionally burden Rubin's right of free speech, we

find that neither do they violate his Equal Protection right."
*Id.*

**[24]** Like the non-incumbents and peace activists in *Rubin*, street performers are not a suspect class. *See Cleburne*, 473 U.S. at 443 (explaining the limited set of "suspect" classifications and declining to expand the limited set to mental retardation). Thus, as in *Rubin*, the only question is whether the Campus Rules violate the constitutional right to free speech.[36] As explained above, the rules satisfy the standards for valid time, place, or manner restrictions on speech. Like the ballot rule in *Rubin*, the Campus Rules "further an important governmental interest, . . . are non-discriminatory, are viewpoint-neutral, and . . . do not severely limit a candidate's First Amendment rights. Therefore, they are not unconstitutional on their face . . . ." *Rubin*, 308 F.3d at 1019.

V

In sum, Rules F.1, F.2, F.3.a, F.5, and G.4 satisfy the requirements for valid restrictions on expression under the First Amendment. Such content neutral and narrowly tailored rules, which leave open ample alternatives for communication, must be upheld. The rules also survive rational basis review under the Fourteenth Amendment.

The order granting summary judgment to Berger is REVERSED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

---

[36]The relevant constitutional right should not be characterized as a "constitutionally protected right to perform magic tricks, create balloon sculptures, and receive voluntary donations in a public park," as erroneously suggested by the magistrate who considered Berger's 1996 complaints.

**Volume 2 of 2**

BERZON, Circuit Judge, dissenting in part and concurring in part:

"It is offensive — not only to the values protected by the First Amendment but to the very notion of a free society — that in the context of everyday public discourse a citizen must inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002). Today the majority endorses just such a scheme, requiring individuals to obtain permits from the government before they may engage in communicative activity. Worse, it does so in the context of a public park, a traditional public forum, with regard to which "the government bears an extraordinarily heavy burden when it seeks to regulate free speech." *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006) (internal quotation marks omitted) ("*ACLU II*"), because parks have, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.*, 307 U.S. 496, 515 (1939); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Nor does the majority stop there: It goes on to declare that public park-goers, using this quintessential public forum, are a captive audience, justifying still more restrictions on speech. Yet, "as society becomes more insular in character, it becomes essential to *protect* public places where traditional modes of speech and forms of expression can take place." *ACLU II*, 466 F.3d at 791 (emphasis added). The majority's opinion, far from obeying this admonition, validates a regulation that prevents communication between citizens in a public

park, making this case part of a "nationwide trend toward the privatization of public property," *id.*, transforming formerly public spaces into private, heavily-regulated domains.

The case concerns the Seattle Center, a public park — although the majority obscures this basic fact through a euphemism, calling the Center an "entertainment zone." Indeed, Seattle Center, in the heart of Seattle, declares itself "the nation's best gathering place," and a "public space open to everyone." Despite these boasts, the Seattle Center has imposed a raft of speech restrictions on park-goers and street performers. These restrictions were adopted, we are told, to reduce space conflicts between street performers and to reduce the frequency of incidents where performers behave abusively towards their audiences. Some of the Seattle Center's regulations forward this substantial public purpose without unnecessarily burdening protected speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted), and I am willing to assume that these regulations are valid. But at least two of them go far further, working to turn the Seattle Center into a sterile theme park.

For the truth is this: Although one might think otherwise from reading the majority opinion, the permitting scheme the majority approves serves no discernible purpose whatever, other than to identify speakers to the government in advance of their speech. There is no limit on the number of permits, and although another part of the rule designates certain locations at the Seattle Center for street performers generally, the permits do not assign any particular location at the Seattle Center to any particular street performer. So there is simply no crowd or traffic control function served by the permitting scheme.

There is no case anywhere, as far as I can tell, approving a speech permitting scheme of this kind — that is, one applicable to single individuals and having nothing to do with allocating scarce public space among competing users. So,

although this particular permitting scheme may seem innocuous, the principle that American citizens ordinarily do not need government permission to speak in public places is a precious one, and one the majority entirely ignores. I therefore dissent from Part III.A of the majority opinion, which upholds the permit scheme. Because a requirement that performers holding permits wear badges depends upon the existence of the permit scheme, I also dissent from Part III.B, which upholds the badge requirement.

That the administrators of the Seattle Center fundamentally misunderstand the nature of public parks is made even clearer by the park's astonishing "captive audience" rule, which the majority upholds in Part III.E. The idea of ordinary parkgoers as, in any sense, "captive" is deeply offensive to the First Amendment. Yet, the Seattle Center has imposed a broad "captive audience" rule which bans *any* speech — artistic or political — within thirty feet of a line of people, or even of people eating lunch in a seating area, because these groups are supposedly "captive." Worse, because the rule's application depends on the particular location of the audiences it "protects," the rule creates just the sort of system of "floating" speech restrictions, hard to enforce and harder to obey, that the Supreme Court struck down in *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377-80 (1997). I cannot agree that this radical extension of captive audience law into a context in which it does not apply, and in a manner already held to be impermissible, is constitutional.

Only those parts of the Seattle Center's regulations that merely channel speech to prevent conflicts between performers, and between performers and the public, are even arguably constitutional: A regulation designating first-come, first-served areas for street performances[1] and a ban on active solicita-

---

[1] It may be that there could be valid as-applied challenges to this rule. "There is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the

tion.[2] I therefore concur only in III.C and III.D. of the majority opinion, which uphold those regulations.[3]

---

content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Galvin v. Hay*, 374 F.3d 739, at 749-53 (9th Cir. 2004). Because the "location of speech, like other aspects of presentation, can affect the meaning of communication and [therefore] merit First Amendment protection," *id.* at 751, the fixed performance locations could impair the meaning of some performances designed to be seen in particular areas of the Seattle Center. The present plaintiff, however, brings no such as-applied challenge.

[2]Even the active solicitation regulation is somewhat constitutionally suspect. In *ACLU II*, we held that it is "beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech" and struck down a solicitation ban in Las Vegas. 466 F.3d at 792. We held that Las Vegas's total ban on "messages that contain soliciting content" was a content-based restriction. *Id.* at 795-97. Doing so, we approvingly quoted Justice Kennedy's concurring opinion in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (*"ISKCON"*) in which he explained that if a "solicitation regulation prohibited all speech that requested contribution of funds" he would strike it down. *ACLU II*, 466 F.3d at 795 (quoting *ISKCON*, 505 U.S. at 704 (Kennedy, J., concurring). Because I understand the Seattle Center's regulation to ban only certain aggressive manners of donation requests, rather than requests for donations generally, and because I believe the Seattle Center has demonstrated that the regulation narrowly addresses its problems with aggressive solicitation by street performers, I concur, albeit somewhat dubiously, in upholding this regulation.

[3]I do not concur in Part IV because the majority's holding is partially premised on its conclusion, which I reject, that the permit requirement (and its associated badge requirement) do not violate the First Amendment. *See* Maj. Op. at 243-44. I agree, however, that street performers are not a suspect class for the purposes of the Equal Protection Clause, *see City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-42 (1985) (discussing suspect classes). Although the permit requirement *does* burden a fundamental right, it is not a "*class-based* denial of a particular right," *Pyler v. Doe*, 457 U.S. 202, 217 n. 15 (1982) (emphasis added) and so does not implicate equal protection. I also agree with the majority that, because the active solicitation bar and location designation rule do not violate the First Amendment, they also do not violate the Equal Protection Clause.

## I.  The Permit Requirement

The majority's description of the permit requirement is a triumph of misdirection, upholding a speech *registration* scheme but relying upon cases that instead uphold much less troublesome systems of speech *coordination*.

In general,"the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the context of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). Under this standard, even in a public forum, governments may regulate to allow all voices to be heard through "coordination of use," *Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022, 1036 (9th Cir. 2006) — by, for instance, ensuring that a parade does not march right through a street festival or unduly interfere with street traffic. Such "coordination of use" is, in other words, a significant governmental interest.

As the general time, place, or manner standard indicates, however, this authority to regulate speech is limited even when there is a legitimate coordination purpose to be served: "The government's right to limit expressive activity in a public forum is sharply circumscribed" and our review is searching and careful. *ACLU II*, 466 F.3d at 791 (quoting *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998)); *see also Santa Monica Food not Bombs*, 450 F.3d at 1035-36 (9th Cir. 2006) (same); *A.C.L.U. v. City of Las Vegas*, 333 F.3d 1092, 1098 (9th Cir. 2003) ("*ACLU I*") (same); *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (same); *Grossman v. City of Portland*, 33 F.3d 1200, 1204-05 (9th Cir. 1994) (same). We are particularly skeptical of coordination permit requirements which are, after all, "prior restraint[s]" on speech and therefore raise serious concerns over

limits on spontaneous expression. *Grossman*, 33 F.3d at 1205 n. 9 (quoting *Rosen v. Port of Portland*, 641 F.2d 1243, 1250 (9th Cir. 1981)); *see also Santa Monica Food Not Bombs*, 450 F.3d at 1052-53 (upholding some permitting requirements, but not others, applicable only to large groups of people).

But our usual careful inquiry into how well a permit system serves its coordination purpose cannot even begin in this case. For the Seattle Center's registration scheme serves *no* coordination purpose at all. Instead, it serves only one purpose: To allow the government to know who is planning to engage in communication through street performance at the Seattle Center at some indeterminate time in the future. This "purpose," such as it is, is not a permissible governmental interest at all, much less a significant one.

More specifically: The Seattle Center requires all street performers to obtain a permit from the Director of the Seattle Center, valid for one year, in order to perform. The permits have nothing to do with where or when the performance will occur. In fact, "[s]pecific performance times will *not* be assigned to a performer by the Center." (Emphasis added). Instead, "[p]erformance locations are available on a first come first served basis." "If the performer abandons the location, for any reason, the location may be utilized by another performer. Locations may not be 'saved' or 'reserved.' " So it is the large number of well-located performance spots — a restriction which I am willing to assume is valid in this unusual context — that reduce performer conflicts over space. The permit requirement has nothing to do with the space allocation effort, but is simply a gratuitous restriction on speech.[4]

---

[4]On its face, the rules apply very broadly indeed. The Seattle Center's rules define a "street performer" as "a member of the general public who engages in any performing art or the playing of any musical instrument, singing or vocalizing, with or without musical accompaniment, and whose performance is not an official part of an event sponsored by the Seattle Center or by a Seattle Center licensee." Protest songs, playing the guitar

I am aware of no case — ever— that has approved a permit requirement in a traditional public forum where there is absolutely no coordination of use purpose. The majority has cited none. Given that speech registration is, by its nature, only justifiable if it serves a significant government interest, it is not surprising that such cases do not exist. Indeed, we have expressed profound skepticism of such permits even when they *do* serve a coordination purpose.

In *Grossman*, for instance, we struck down a permit requirement for demonstrating or gathering in parks in Portland, Oregon that was designed to "permit efficient time, place and manner regulation," 33 F.3d at 1205 n. 9 (internal quotation marks omitted), and which required permit applicants to register seven days in advance of any gathering, "describing the details of the planned event" in their applications. *Id.* at 1204. Although we "sympathize[d] with the City's concern for the safety and convenience of park users," we could not agree that this interest could justify the "substantial restrictions" inherent in a permit to speak. *Id.* at 1206. "Both the procedural hurdle of filling out and submitting a written

---

at a picnic, even whistling, are swept up into this broad requirement. Reading the text of the rule, I would have no difficulty holding that the rule is unconstitutionally overbroad. But Seattle urges us to read the definition far more narrowly than its text, to apply essentially only to professional street entertainers and buskers. While "it is common to consider a city's authoritative interpretation of its guidelines and ordinances . . . [t]o affect the constitutional analysis, such a limiting construction must 'be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice'." *Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022, 1035 (9th Cir. 2006) (quoting *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770 (1988)). There is no such binding construction or textual incorporation of the city's asserted limits here, and it is not obvious to me that well-established practice at the Seattle Center indicates that the broad text of the rule has been so limited. Still, the majority thinks so; I am willing to go along because the rule cannot survive even with that narrowing construction.

application and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Id.*; *see also N.A.A.C.P., Western Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984) ("The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations inhibits speech."); *Rosen*, 641 F.2d at 1249 (advance notice "drastically burden[s] free speech"). So, although the *Grossman* permitting scheme did, unlike the permitting rule here, purport to serve the significant governmental interest of coordinating the use of public space, the burdens it created were too large to be endured. 33 F.3d at 1208-09.

We have taken these burdens very seriously: In *Rosen*, where the permit ordinance required only one day's notice and advance disclosure of the name of the speaker, we struck it down, holding that the "interest in knowing in advance what type of free speech activities may occur . . . is insufficient to justify an ordinance so broad in its application and with so chilling an impact on the exercise of [F]irst [A]mendment rights." 641 F.2d at 1249.

The Seattle Center scheme is not only unsupported by a governmental coordination interest; it also reaches individual speakers.[5] This reach alone renders it suspect. When we have allowed coordination permits it has been for large groups: "As the cautionary language in our earlier opinions indicates, the significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups of people travel together on streets and sidewalks." *Santa Monica Food Not Bombs*, 450 F.3d at 1039; *see also Grossman*, 33 F.3d at 1206 ("Some type of permit requirement *may* be justified in the case of large

---

[5]The two features are, of course, closely related. Only large groups of people in public parks and on public streets create a need for coordination of uses of public space.

groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial.") (emphasis in original).

Conversely, we have *never* countenanced the imposition of permits for individual speakers in public fora. Indeed, the possibility that the ordinance in *Grossman* could reach "the actions of single protestors," was one of the reasons we struck that ordinance down as unconstitutional. *Id.*; *see also Cox v. City of Charleston, South Carolina*, 416 F.3d 281, 285 (4th Cir. 2005) ("[U]nflinching application" of a permit requirement "to groups as small as two or three renders it constitutionally infirm.").[6]

In brief, then, we and other courts have expressed deep skepticism that a permit can ever be appropriate when applied to small groups or individuals. We have never approved such a permitting scheme, nor has any other court, as far as I am aware. Yet, the Seattle Center adopted, and the majority upholds, a permitting program that does not have a use coordination purpose, that applies on its face to individuals,[7] and that imposes a prior restraint on speech with no purpose other

---

[6]The majority badly misreads *Charleston*, Maj. Op. at 220 n. 14, holding the case irrelevant because it did not "announce a numerical floor below which a permit requirement cannot apply." *Charleston* declined to do so because it felt that writing a hard rule was a legislative, not a judicial task, not because it countenanced permits for individual speech. *Charleston*, 416 F.3d at 286. The court was very clear that a permit ordinance attaching to small groups of individuals would be overbroad. *See id.* (collecting cases). It emphasized that any "legislative body" crafting a permit requirement "should tailor that requirement to ensure that it does not burden small gatherings posing no threat to the safety, order, and accessibility of streets and sidewalks." *Id.* at 287.

[7]Although street performers do, of course, hope to draw crowds, this goal is of little moment to the analysis. The individual protestors in *Grossman* and *Charleston* also undoubtedly hoped to attract crowds of people eager to learn their views. We have, in any event, emphasized that coordination permits are only appropriate for far more substantial crowds than any street performer is likely to draw at one time. *See Santa Monica Food Not Bombs*, 450 F.3d at 1043 n. 17 ("Whether 150 people is the outside [lower] limit for a permitting requirement is a question we do not decide, except to caution that a substantially lower number may well not comport comfortably with the limited governmental interests at play in public parks and open spaces.").

than to make government surveillance and control of the speakers easier.[8] It is hard to think of a more obviously unconstitutional measure in the First Amendment context.

The majority, nonetheless, relies on a few coordination cases to uphold this offensive registration scheme. Its cases, *Cox v. New Hampshire*, 312 U.S. 569 (1941), *Poulos v. New Hampshire*, 345 U.S. 395 (1953), and *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002), say nothing about speech registration. All three cases upheld coordination programs, not registration schemes. That these cases upheld permits actually serving a "time, place, or manner"-related purpose does not suggest that we should uphold a permitting program that does no such thing.

*Cox*, for example, upheld a permit requirement for parades, public meetings, and "theatrical or dramatic representation[s]" which required each permit application to "specify the day and hour" of the planned performance. *Cox*, 312 U.S. at 571 & n. 1. The permits in *Cox* thus genuinely did regulate the "time, place and manner" of parades and demonstrations "in relation to the other proper uses of the streets." *Id.* at 576.

In *Poulos*, a coordination requirement was also at issue. *See Poulos*, 345 U.S. at 398 n. 2 (setting forth a "day and hour" coordination requirement for permits). Once again the Court upheld the rule, this time in the context of religious services, because the requirement "merely call[ed] for the adjustment

---

[8]That the Seattle Center does not require a permit for each separate speech act but one permit to cover a year's speech does not ameliorate these concerns. Permit issuance is not instant and, even if it were, anyone who wishes to spontaneously perform in the park must seek out the permit office (if it is open) and fill out forms before they speak. The absence of a specified waiting period does not alter the practical reality that every permit application system imposes *some* delay.

of the unrestrained exercise of religions with the reasonable comfort and convenience of the whole city." *Id.* at 405.[9]

*Thomas* also considered a permitting-based coordination plan that conformed permitted activities with other uses and with general park purposes, *see Thomas,* 534 U.S. at 379 n. 1 (setting forth permit requirements), and upheld the permit requirement because it was designed "to coordinate multiple uses of limited space," among other related purposes. *Id.* at 322. *Thomas* was decided quite narrowly and does not provide *carte blanche* for park permits, despite what the majority suggests. Most importantly, because the petitioners in *Thomas* challenged the ordinance in question only on the ground that it conferred allegedly over-broad permitting discretion, the Court did not consider other concerns that might be relevant here. *See id.* at 322 & n. 3 ("Petitioners do not argue that the Park District's ordinance fails to satisfy other requirements of our time, place, and manner jurisprudence. . . ."). We have twice recognized *Thomas*'s limited scope. *See Santa Monica Food Not Bombs*, 450 F.3d at 1037 n. 15 ("Appellants here challenge the 'other' requirements of time, place, and manner jurisprudence, explicitly not at issue in *Thomas.*"); *Galvin v. Hay*, 374 F.3d 739, 747 n. 5 (9th Cir. 2004) ("The Court in *Thomas* considered only a challenge to the breadth of official discretion" and not other issues.).

In short, the law is clear: Permits for speech in traditional public fora are disfavored and may be upheld only when they are tailored to serve a coordination of use purpose, including traffic and safety concerns, created by large groups of individuals engaging in First Amendment-protected activity. Inconsistency with this long-established principle is enough to show that the Seattle Center's rule is fundamentally flawed.

---

[9]I note that *Cox* and *Poulos* both antedated the development of the modern standard for approving time, place, and manner restrictions in public fora, and may not be fully controlling after that development.

But there is more. The Supreme Court has consistently struck down speech registration permitting programs in the one context, solicitation of private homes, where they have been put in place with some regularity. There is no interest present here greater than those the Court deemed insufficient to support speech registration in that context.

In *Watchtower Bible*, for instance, a small Ohio village required solicitors to register before going door to door to prevent fraud, protect residential privacy, and prevent crime. 536 U.S. at 168-69. The Supreme Court struck down the registration scheme because it imposed significant First Amendment burdens, including a heavy burden on spontaneous speech. *Id.* at 166-67. *Watchtower Bible* was not the first time that the Court had struck down license requirements for solicitors on First Amendment grounds. *See also Cantwell v. State of Connecticut*, 310 U.S. 296, 306-07 (1990) (striking down license requirement for religious solicitation); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 638-39 (1980) (striking down solicitation permit requirement); *Schneider v. State of New Jersey*, 308 U.S. 147, 152 (1939) (striking down permitting scheme for all forms of solicitation). Speech in public parks is no less protected than speech on citizens' doorsteps. And the Seattle Center asserts no stronger interests than those forwarded in the house-to-house solicitation context.

That, as the majority notes, Maj. Op. at 222-23 n. 19, the permitting schemes in *Cantwell*, *Schneider*, and *Village of Schaumburg* had other fatal flaws does not alter the fundamentally "offensive" character of speech registration requirements. *Watchtower Bible*, 536 U.S. at 166. As *Watchtower Bible* made clear in the context of political or religious speech, but with reasoning that surely extends to artistic expression,[10] even if the issuance of permits were purely a "ministe-

---

[10]Just as door-to-door canvassing plays an "important role in our constitutional tradition of free and open discussion," *Watchtower Bible*, 536

rial task," performed promptly and for free, "a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition." *Id.*

I note, finally, that even if registration to identify speakers were ever acceptable, it is, from a purely practical perspective, entirely unnecessary here. The rule targets street performers, not anonymous members of the public. Such people stake their careers on being readily identifiable, develop distinctive shows, and are frequent return visitors to their performance sites. It would not be hard for a police officer patrolling the Seattle Center to recognize a rogue fire-swallower. Indeed, incident reports in the record make reference to such distinctive characters as a hula-hooping magician and "the puppet guy." If Seattle Center officials *are* having trouble tracking down such easily identifiable characters, which I doubt, the solution is to pay more attention, not to do violence to the Constitution.[11]

---

U.S. at 162, so too does the use of public parks for artistic and creative endeavors (which may also often include political content) have deep roots: Parks are classically thrown open to public expression. *See Perry Educ. Ass'n*, 460 U.S. at 46 (1983). For this reason, the majority's claim that *Watchtower Bible* is inapposite because street performing is not as important as religious and political canvassing, Maj. Op. at 222, is not persuasive. And the majority's "most important[ ]", *id.*, distinction — that the ordinance in *Watchtower Bible* "bore no relation to the municipality's stated purposes" while the permit requirement is closely related to government interests — makes little sense. The permit requirement here in fact shares the problems discussed in *Watchtower Bible*.

[11]As the majority notes, Maj. Op. at 218 n. 13, the Seattle Center's badge requirement is intimately connected to the permit requirement: The permits are to "be evidenced by a badge that shall be worn or displayed by a performer in plain view at all times during a performance." Because I believe that the permit requirement itself is unconstitutional and because no badges will be issued without permits, I have no need to decide whether an independent badge requirement in this context would be constitutional. I therefore do not concur in Part III.B of the majority opinion, which upholds the badge requirement, premised largely on the supposed constitutionality of the permit requirement.

## II.   The "Captive Audience" Rule

Having simply ignored decades of First Amendment juris-prudence to uphold the permit requirement, the majority continues its radical rewrite of free speech law in public parks by upholding the Seattle Center's so-called "captive audience" rule, Rule G.4, which imposes significant limits on speech to supposed "captives" using park facilities. If there is any audience that is definitively not captive — any group of people who the government has no obligation or power to shield from speech — it is the public in a traditional public forum. It is in such places that freedom of speech is at its height and is most zealously to be guarded.

That duty is particularly important now, when the very concept of public space is under threat. "If the trend of privatization continues . . . citizens will find it increasingly difficult to exercise their First Amendment rights to free speech, as the fora where expressive activities are protected dwindle. 'Awareness of contemporary threats to speech must inform our jurisprudence regarding public [fora].' " *ACLU II*, 466 F.3d at 791 (quoting *ACLU I*, 33 F.3d at 1097); *see also Grossman*, 33 F.3d at 1205 n. 8 (protection of parks as open fora is "increasingly significant now, when the extremely rich have an enormous variety of privately-owned media through which to reach the public" but persons of ordinary means must rely on free fora for public debate like the parks.). The majority displays no awareness of its duty to protect the traditional role of public parks, and still less awareness of the basics of captive audience law.

The Seattle Center bans all "speech activities" — defined to include "both political speech and commercial speech" — within thirty feet "of any captive audience," or "of any building entrance" or "of any person engaged in any scheduled event that is sponsored or co-sponsored by Seattle Center." "Captive" audiences are defined as including persons "waiting in line to obtain tickets or food or other goods or services

or to attend any Seattle Center event," or "seated in any seating location where foods or beverages are consumed" (a group which the majority assumes includes picnickers). None of these restrictions apply to "activity conducted by City employees or licensed concessionaires," or pursuant to a "Seattle Center license or other agreement." Members of the public waiting in line, having lunch, or sitting or standing anywhere near an entrance, are insulated from all speech, except that of the Seattle Center and of those it has allowed to speak. This prohibition is an extraordinary restriction on the use of public space.

First, as Berger argues, the city's preference for concessionaires and licensees leads to the odd result that commercial speech, which receives more limited First Amendment protection than political and artistic speech, is allowed and encouraged, while artistic and political speech is not. This result, alone, suggests profound problems with the rule. *See G. K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1081 (9th Cir. 2006) (ordinance is invalid if it favors commercial speech over noncommercial speech); *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 819-20 (9th Cir. 1996) (same).

Worse, the very premise of the restriction is wrong. Public park-goers are not a protectable captive audience for constitutional purposes. "The plain, if at times disquieting truth, is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, we are inescapably captive audiences for many purposes." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 (1975) (internal quotation marks omitted). But only in "narrow circumstances" may the government restrain speech to protect such audiences; "the burden normally falls upon the viewer" to avert his or her eyes, or the hearer to cover his or her ears, not upon the speaker to be silent. *Id.* "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing

that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21 (1971).

Yet the majority suggests that "Seattle Center Patrons" are captives because the "Seattle Center offers desirable facilities for public entertainment, relaxation, and edification" and that therefore it "had the right to protect captive audiences seeking to enjoy such functions without being forced to choose [between] enduring harassment and leaving the facilities." Maj. Op. at 241. This argument is entirely back-to-front: The fact that people wish to gather in a park like the Seattle Center is precisely why protecting speech there is so important, not a justification for limiting it. Use of the parks for public discussion and gathering has "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague*, 307 U.S. at 515. "It must not, in the guise of regulation, be abridged or denied." *Id.* at 16. Declaring, as the majority does, that desirable gathering places must be insulated from speech turns this ancient proposition on its head.

The argument also has no apparent stopping place: Why individuals waiting in line or eating sitting down in designated areas are any more "captive" — or any more interested in staying in the park instead of leaving — than parents watching children in a playground, runners on a park track, or young people tossing about a frisbee in a park field, we are not told.[12]

The short of the matter is that the possibility of objectionable speech in a public place is not a justification for limiting speech. *See Perry Educ. Ass'n*, 460 U.S. at 46 (emphasizing

---

[12]Moreover, as I discussed above, citizens are very often not free from solicitation and pamphleteering in their own homes, yet government restrictions on such activities are frequently invalidated. *See Watchtower Bible*, 536 U.S. at 160 and n. 10 (collecting cases striking down permit requirements for door-to-door solicitation).

the liberty of speech and discussion inherent to a traditional public forum). Public park-goers certainly have no "substantial privacy interest," *Cohen*, 403 U.S. at 21, that must be defended; they are in the public sphere. *See also Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974) (advertising space on public streetcars is not a "First Amendment forum" like a "park," and a streetcar "captive audience" is in a situation "different from the traditional settings where First Amendment values inalterably prevail."). If a captive audience is to be found at the Seattle Center, such an audience could be found in just about any public park anywhere. For that matter, people walking down the street usually want to get where they are going; on the majority's rationale, they would be "captive" also, because they have no choice but to walk from here to there. Any such result would be deeply at odds with our law, as it would swallow entirely the broad protection of speech in public fora.

But the majority does not only import captive audience law into a context in which it simply does not apply. It also relies on a wholly inapposite line of cases concerning the unique privacy and self-determination interests involved in protecting abortion clinics and medical facilities: The majority justifies upholding the captive audience rule by pointing out that the thirty-foot buffer zone the Seattle Center wishes to impose is about the same size as the buffer zone at issue in *Madsen v. Women's Health Center*, 512 U.S. 753 (1994).

The interests involved in *Madsen*, however, could not be more different than those we consider here. In that case, the Supreme Court upheld a state court's injunction creating a 36-foot buffer zone around the entrances of an abortion clinic in which picketing and demonstrating, among other activities, were barred. *Id.* at 768-71. The idea that park-goers are in any way similarly situated to the patients and doctors of an abortion clinic under siege by hostile protestors, is absurd.[13] The

---

[13]Even the process by which the buffer zone was designed and upheld in *Madsen* is entirely distinct. In *Madsen*, abusive abortion protesters were

Supreme Court has made the distinctiveness of the interests at issue in such cases very clear. *See Hill v. Colorado*, 530 U.S. 703, 728-30 (2000) (upholding 8-foot regulatory buffer around clinic entrances due to the "unique concerns that surround health care facilities," where those using the facilities "are often in particularly vulnerable physical and emotional conditions").[14] It trivializes the interests carefully balanced in those cases to extend them in this way. Indeed, we have already rejected such a comparison in *Kuba v. 1-A Agricul-*

forcing doctors and patients to run a "gauntlet" to enter an abortion clinic. 512 U.S. at 758. A district court imposed a narrow injunction to curb the illegal behavior, which failed to solve the problem. *Id.* at 758-59. Only then, after more speech-protective remedies had failed to cure the illegal activity, did the district court impose the broader injunction that the Supreme Court examined. *Id.* What we have here is not an injunction imposed after illegal behavior but a prophylactic rule that applies to perfectly law-abiding individuals.

Moreover, the Supreme Court in *Madsen* upheld the buffer zone, created by the broader injunction, based on the particular geography of the clinic, 512 U.S. at 769, giving "some deference" to the state court's familiarity with the situation, and noting that the earlier, "much narrower" injunction had failed to protect access to the clinic. *Id.* at 770. The injunction had been fitted to the particular circumstances, and in a context where reproductive rights, public safety, and medical privacy all weighed in the balance. *Id.* at 768-69. Those important considerations are not at issue here, and there is no evidence that the thirty-foot buffer zone has been carefully tailored to the particular geography of the Seattle Center.

[14]Nor does the fact that *Kuba,* 387 F.3d at 863, struck down a 75-foot buffer zone on speech around an exhibition hall's entrance, along with other restrictions, have much bearing. The majority seems to think that because the thirty-foot rule here is smaller than the 75-foot rule in that case, it is somehow more acceptable. *Kuba* provides no support for this proposition, as it did not address whether a smaller buffer zone would have been acceptable.

Also, context matters when analyzing speech restrictions. If, for instance, a *five* foot buffer put speakers on the other side of hedges, or down hills out of sight, it might well be unacceptable. *See id.*, 387 F.3d at 861-63 (carefully analyzing the relevant geography of the site at issue in that case).

*tural Ass'n*, 387 F.3d 850, 861 n. 10 (9th Cir. 2004), explaining that patrons of a "place of public entertainment" were not a captive audience as in *Madsen* and its progeny, because they were obviously not "particularly vulnerable," as are the patients and doctors in such cases.

The majority nonetheless asserts that the First Amendment rights to intimate and expressive association recognized by *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) and *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) justify similar protections to those at issue in the *Madsen* line of cases. Maj. Op. at 242 n. 35. This argument is both rife with error and blind to the role of public parks as a location for interchange among citizens.

First, it is not at all clear that people "wishing to exercise their interest in private and public expression of individuals in intimate association with family and friends at a picnic," as the majority puts it, even implicate the rights at issue in *Dale* and *Roberts*. Those cases concern two sorts of association: "Certain intimate human relationships," *Roberts*, 468 U.S. at 618, and expressive association "for the purpose of engaging in those activities protected by the First Amendment." *Id.*; *see also Dale*, 530 U.S. at 647-48.[15] Picnickers do not fall naturally into either category (the majority appears to be melding the two when it refers to the "expression of individuals in intimate association") unless *Dale* and *Roberts* are far more sweeping than they have previously been understood to be.

Second, the flat ban on communication at the Seattle Center is more extreme than the restrictions considered in the *Madsen* line of cases. In those cases, unlike here, there was a history of aggression justifying some speech restrictions. *See*

---

[15]It is also worth noting that neither *Roberts* nor *Dale* are concerned with protecting such associations from other private parties but instead deal with "undue intrusions by the State." *Roberts*, 468 U.S. at 618; *see also Dale*, 530 U.S. at 647-48.

*Madsen*, 512 U.S. at 757-59; *Schenck*, 519 U.S. at 362-65; *Hill*, 530 U.S. at 709-10. Yet, in those cases, where real and documented threats were present, the restrictions put in place were still narrower than the flat ban on all "speech activities" the majority upholds today. *See Madsen*, 512 U.S. at 760 (ban on "approaching any person seeking the services of the Clinic *unless* such person indicates a desire to communicate") (emphasis added); *Schenck*, 519 U.S. at 366 n. 3 (injunction allowing sidewalk counseling "of a non-threatening nature"); *Hill*, 530 U.S. at 707 n. 1 (ordinance barring approaching within eight feet of a person entering clinic "unless such other person consents"). Here, in contrast, the Seattle Center's "captive audience" regulation would forbid a political campaign representative from offering a handbill to a consenting picnicker in an entirely benign — even silent — manner. Are we to suppose that such a phantom threat to picnic tranquility justifies more stringent controls on speech than those gingerly applied in the *Madsen* line of cases? The majority defends a draconian solution to an undocumented problem with its strained reading of *Dale* and *Roberts*.

Most importantly, perhaps, the majority again forgets in its invocation of *Dale* and *Roberts* that it is a public park we are dealing with: As I have already discussed at length, the tradition of open discourse in such places is central to our constitutional heritage. There, the balance between the majority's purported "right" to picnic in peace and lively, even raucous, speech has been struck in favor of speech since "time out of mind." *Hague*, 307 U.S. at 515. The speech whose protection reaches its zenith in public fora extends beyond ideas capable of relatively precise, detached explanation to communication serving a more emotive function, including efforts to persuade, entertain, and elucidate through strong language, and to calls to honor, to disapprove, to shame, and to celebrate. *See*, *e.g.*, *N.A.A.C.P. v. Claiborne Hardware Corp.*, 458 U.S. 886, 910-911 (1982) ("Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action."); *Terminiello v. City of Chicago*,

337 U.S. 1, 4 (1939) ("[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."). The majority's vision of a public park as a place regulated to protect the placid outings of "associating" citizens who are forbidden to engage in "speech activities" at all, lest someone be unsettled, is alien to the values instinct in the First Amendment, and to the entire public forum concept. Are two people chatting on a street corner in an "association" that can properly be protected by preventing a fellow citizen from offering them a handbill? Are picnickers on the National Mall in Washington, D.C., to be so "protected"? The majority's reading of *Dale* and *Roberts* to create such a sweeping ability to protect "association" vitiates speech protections in all public fora locations.

Further, even in the abortion clinic context, where speech restrictions may be somewhat broader, the Supreme Court has struck down a captive audience rule that bears a marked resemblance to the one the majority upholds today. In *Schenck*, the Court considered an injunction which barred demonstrations within fifteen feet of any person or vehicle using an abortion clinic, *id.* at 367, and held that this "floating" buffer created an uncertain and over-broad system of restraints on speech. 519 U.S. at 377-80. As clinic patients moved, speech-restricted areas shifted across the landscape in an unpredictable and, in the Court's view, unacceptable manner. *Id.*

The same problems are present here and are not leavened by the clear public safety issues present in *Schenck*. The Seattle Center's captive audience rule applies within thirty feet of any line, any audience, and even any group of people having lunch in a seating area. Crowds move. As the end of a line shifts, or a picnic table is occupied, the captive audience rule snaps on to bar speech within thirty feet of the line or of the picnicking park-goers. This system of shifting "speech-free"

zones is precisely the sort of capricious restraint, likely to chill far more speech than the Seattle Center would be justified in regulating, that *Schenck* struck down. 519 U.S. at 377-80.

By somehow finding a captive audience in a public park and then endorsing a buffer zone as restrictive as that struck down in *Schenck*, the majority turns the law on its head. It does not simply abdicate its responsibility to safeguard the rights of the public but creates dangerous new legal principles that have no obvious stopping point. I cannot go along with this perilous course.

## III.   Conclusion

The majority does not acknowledge how radically its holdings alter our law, creating a legal structure which will make it far easier to shut down discourse in public parks and other traditional public fora. Democracies survive and grow through public conversations among their citizens. For this reason, we have always viewed any limitations on speech in traditional public fora with extreme skepticism. Today's opinion departs from that long tradition. I respectfully dissent.